```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
                                                          :
Silverman Sclar Byrne Shin & Byrne P.C.                   :
f/k/a Silverman Collura Chernis & Balzano,                :
P.C. f/k/a Silverman Collura Chernis &                    :
Balzano, P.C., Paul Chernis, and                          :   OPINION AND ORDER
Gary Mair,                                                :
                                                          :   03-CV-0308 (DLI)(MDG)
                    Plaintiffs,                           :
                                                          :
          -against-                                       :
                                                          :
Chicago Insurance Co.,                                    :
                                                          :
                    Defendant.                            :
----------------------------------------------------------x
```

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiffs Silverman, Collura, Chernis & Balzano, P.C. (the "Silverman firm"), Paul Chernis, and Gary Mair seek judgment directing defendant Chicago Insurance Company ("CIC") to defend and indemnify them from claims asserted against them in an underlying legal malpractice action. Plaintiffs also seek reimbursement of costs incurred in defending the underlying lawsuit. Both plaintiffs and defendant have moved for summary judgment. For the following reasons, summary judgment is granted in part and denied in part.

**I.      Facts**

Plymouth Organization ("Plymouth") retained the Silverman firm in connection with a business plan to raise funds through a private offering of securities. The Silverman firm prepared an offering memorandum for the private placement, pursuant to Rule 506 of Regulation D of the

1

Securities Act of 1933, dated August 12, 1998. Michael Freedman, an attorney at the Silverman firm, but not a party to this action, was principally involved in drafting the offering memorandum. As admitted by Chernis, the offering memorandum provided that $500,000, or ten percent of the entire $5 million offering, could be paid to finders for conducting the offering. The offering memorandum contained the following language:

> The Company intends to offer the Shares directly to the public through its officers and directors and/or finders on a "best efforts" basis. The Company has not retained a placement agent in connection with this Offering. On sales made by finders, a fee of up to 10% per Share may be paid by the Company. No commissions will be paid on sales made through the Company's officers and directors.

(Pls.' Ex. R at 2.) Considering this language, since sales would be made by officers, directors, and/or finders, but no placement agents were to be used, Chernis testified it was understood that commissions would be earned by finders.

According to plaintiffs, they did not learn until March 1999 that, in violation of Rule 502(c) of Regulation D[1] of the Securities and Exchange Act of 1933, Plymouth was possibly using unlicensed commissioned finders to raise funds through the sale of its securities. Upon learning this, plaintiff Gary Mair wrote to Plymouth on March 15, 1999 to request further details, stating that any

---

[1] Rule 502(c) provides, in part:

Except as provided in § 230.504(b)(1), neither the issuer nor any person acting on its behalf shall offer or sell the securities by any form of general solicitation or general advertising, including, but not limited to, the following:

1. (1) Any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio; and

(2) Any seminar or meeting whose attendees have been invited by any general solicitation or general advertising[.]

17 C.F.R. § 230.502(c).

unlawful practice should "immediately cease" and that any sales made through improper finders should be rescinded. (Pls.' Ex. S.) Plymouth responded on March 19, 1999 that it had been "strictly adhering to the guidelines set forth by Mr. Paul Chernis and Mr. Michael Freedman." (Pls.' Ex. T.) Plymouth further reported:

> Under the advice of Mr. Paul Chernis, we were told specifically, if we wanted to allow four to six finders soliciting business using our facilities, this procedure would be fine. This is exactly what we did. These finders are not employees of our Company. They work strictly on a commission basis. We did not and would not create a so-called boiler-room operation with ten or more finders. Also, before any finder is allowed to get on the phone and conduct business, they are properly trained and given information on how our Company is to be presented to qualified investors only.

(*Id*.)

The Silverman firm also learned sometime in 1999 that Plymouth was paying finders thirteen percent commissions rather than ten percent, as stated in the offering memorandum. The Silverman firm prepared an amended offering memorandum for Plymouth, dated August 20, 1999, to reflect the thirteen percent commissions being paid. Paul Chernis testified that he discussed the need to amend the offering memorandum with Michael Freedman. Plymouth continued to use unlicensed commissioned finders and raised around $2 million overall. Plymouth discharged the Silverman firm as counsel by letter dated November 30, 1999. Plymouth terminated its offering after receiving cease and desist orders from several state regulatory authorities. By complaint dated June 6, 2000, Plymouth filed suit against plaintiffs in New York Supreme Court, Richmond County, against plaintiffs for legal malpractice and breach of fiduciary duty. The summons and complaint were served upon plaintiffs on July 17, 2000.

Upon learning of the lawsuit, plaintiffs sent a fax to Bertholon-Rowland Corporation, CIC's

malpractice insurance carrier at the time, dated July 19, 2000, attaching a copy of the summons and complaint and requesting further discussion with a claims attorney. On July 31, 2000, defendant CIC sent a letter to plaintiffs agreeing to provide insurance coverage and defense of the state action by engaging the services of Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Liswoski ("Morgan Melhuish").[2] But Chigago cautioned: "If our investigation reveals that you were aware at that time [November 1999, when plaintiffs were discharged as counsel] of circumstances which could reasonabl[y] be expected to be the basis of a claim, Chicago Insurance Company reserves its right to disclaim coverage based upon your failure to provide timely notice to the Company." (Pls.' Ex. H at 2.) The letter also requested from the Sliverman firm "a detailed chronology of events leading up to [its] discharge," a synopsis of an August 1999 meeting with Plymouth, "any documents or file notes" setting forth advice given to Plymouth regarding the private offering, and a copy of the November 1999 discharge letter. (*Id.*) CIC claims the Silverman firm did not fully respond to these requests and that it did not receive copies of the discharge letter until April 17, 2002.

CIC disclaimed coverage by letter from its coverage counsel dated April 23, 2002. Plaintiffs were told they would not be indemnified for any judgment or settlement or provided any further defense because they failed to provide timely notice of Plymouth's claim against them:

> Based upon the information in our possession it appears, among other things, that beginning in or about March 1999, the claimant advised you that it believed you had provided erroneous legal advice and/or services in connection with its use of outside "finders" to sell its securities, and that such sales had occurred in states where you had not made certain "Blue Sky" filings. Beginning in or about September 1999, the claimant advised you that it was concerned about the effects of such erroneous legal advice and/or services. Beginning in or about November 1999, the claimant advised you that it believed that SC&C had provided negligent legal advice and/or

---

[2] Plaintiffs objected to representation by Morgan Melhuish based on previous experiences with this firm.

4

services, and thereafter terminated its attorney/client relationship with SC&C. Yet CIC first was provided with written notice of this matter on July 19, 2000.

(Pls.' Ex. F at 2.)

## II. Summary Judgment Standards

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)). However, the nonmoving party "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir. 1997) (internal quotation marks omitted). Where interpretation of a contract is at issue, "[s]ummary judgment is generally proper . . . only if the language of the contract is wholly unambiguous." *Compagnie Financière de CIC et de L'Union Européenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "A court may also grant summary judgment regarding the interpretation of ambiguous language if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Id*. at 158.

**III.     Timeliness of Notice**

The portion of the CIC insurance policy requiring timely notice is Section IX.B:

> Upon the **Insured** becoming aware of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** which could reasonably be expected to be the basis of a **Claim** covered hereby, written notice shall be given by the **Insured**, or its representative to the Company together with the fullest information obtainable as soon as practicable.  If **Claim** is made or suit is brought against the **Insured**, the **Insured** or its representative shall immediately forward to the Company every demand, notice, summons or other process received by the **Insured** or the **Insured's** representative.

(Pls.' Ex. C at 5.)  "Claim" is defined in the policy as "a demand for money or services, or the filing of suit or institution of arbitration proceedings or alternative dispute resolution naming an **Insured** and alleging a negligent act, error, omission or **Personal Injury** resulting from the rendering of or failure to render **Professional Services**." (*Id*. at 4.)

Plaintiffs maintain notice was timely because, until Plymouth actually filed the lawsuit against them, admittedly triggering Section IX.B of the policy, at best they were aware of "a mere allegation of negligence." (Pls.' Mem. at 17.)  Plaintiffs argue they are still not aware of any "negligent act, error, omission or Personal Injury" because, as they have maintained continuously, they never told Plymouth to use unlicensed commissioned finders.  Plaintiffs insist the policy does not require notice to be given for a "Potential Claim," which is defined in the policy as "knowledge of any circumstances involving an individual person or entity that could result in a **Claim**." (Pls.' Ex. C at 5.)

Plaintiffs' interpretation of the policy overlooks the fact that notice is required when the insured "becom[es] aware of *any negligent act, error, omission . . . which could reasonably be expected to be the basis of* a **Claim**."   (Pls.' Ex. C at 5 (emphasis added).)  The plain meaning of this phrase is that the notice requirement is not limited to when the insured faces an actual demand

6

for money/services or lawsuit filed. Indeed, the focus is not on the word "Claim" but on any potential "negligent act, error, [or] omission." The fact that "Potential Claim" is also a defined term in the contract, but not used in the first sentence of Section IX.B, as plaintiffs argue, is irrelevant, because the plain meaning of this section is unambiguous. Had the parties intended the notice requirement to apply only to "Claims," they would not have used the phrase "which could reasonably be expected to be the basis of a **Claim**." Indeed, as shown in the second sentence of Section IX.B, which refers to "[i]f **Claim** is made or suit is brought," the parties use the simple word "Claim" when they intend to refer only to actual demands for money/services or lawsuits instituted.

Moreover, this court agrees with the Southern District of New York's interpretation of the very same CIC contract provision in another case: "the policy imposes two separate notice conditions. The first sentence comprises the condition requiring timely notice of a potential claim, while the second sentence refers to notice of an actual claim or suit." *Sirignano v. Chicago Ins. Co.*, 192 F. Supp. 2d 199, 202 (S.D.N.Y. 2002). "The test for determining whether the notice provision has been triggered is whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." *Id*. at 204 (quoting *Sparacino v. Pawtucket Mut. Ins. Co.*, 50 F.3d 141, 143 (2d Cir. 1995)). The insured has the burden of demonstrating timely notice. *Id*. at 203 (citing *Thomson v. Power Auth. of State of N.Y.*, 629 N.Y.S.2d 760, 761 (1st Dep't 1995)).

Here, a reasonable attorney would have had notice of a potential claim in March 1999 when, in response to plaintiff Gary Mair's letter expressing concern over Plymouth's possible improper use of unlicensed finders, Plymouth stated that any use of finders to solicit business was "[u]nder the advice of Mr. Paul Chernis" and that they had been "strictly adhering to the guidelines" set by

7

Chernis and Freedman. (Pls.' Ex. T.) Plaintiffs were also aware of these circumstances in August 1999 when, at the direction of Paul Chernis, the Silverman firm prepared an amended offering memorandum for Plymouth.³ Plaintiffs thus had knowledge of acts that "could reasonably be expected to be the basis" of a claim asserted by Plymouth and were required under the policy to notify CIC "as soon as practicable." Under the circumstances, waiting until July 19, 2000, when Plymouth actually filed a lawsuit against them—sixteen months later (or eleven months from the date of the amended offering memorandum)—was unreasonable, and plaintiffs did not give timely notice as a matter of law. *See Sirignano*, 192 F. Supp. 2d at 203–04 (noting one or two-month delays unreasonable under New York law); *Wilson v. Quaranta*, 795 N.Y.S.2d 532, 533 (1st Dep't 2005) (noting 8 1/2-month delay unreasonable).

---

³ Although plaintiffs make the argument that the notice requirement must be examined with respect to each plaintiff separately, it is clear both Mair and Chernis had notice of Plymouth's allegations, at the very least, by March 1999 and August 1999, respectively. While it was Mair who sent the March 1999 letter to Plymouth, Chernis testified to discussing with Michael Freedman "the need to amend the private placement memorandum to disclose that up to 13 percent was being paid to so-called finders." (Chernis Dep. at 60.) The amended offering memorandum was dated August 20, 1999.

Chernis' and Mair's early awareness of the Plymouth allegations likewise defeats any argument that they should be individually excused under the policy for lack personal participation. Section IX.C of the policy provides:

> Whenever coverage under any provision of this policy would be excluded, suspended or lost . . . because of noncompliance . . . relating to the giving of notice . . . the Company agrees that such insurance as would otherwise be afforded under this policy shall apply with respect to each and every **Insured** who did not personally commit or personally participate in committing one or more of the acts, errors, or omissions . . . *provided that* if the condition be one with which such **Insured** can comply, *after receiving knowledge thereof*, the **Insured** entitled to the benefit of the Waiver . . . *shall comply with such conditions promptly after obtaining knowledge of the failure of any other **Insured** or employee to comply therewith*.

(Pls.' Ex. C at 6 (emphasis added).)

8

CIC was not required to show prejudice when it disclaimed based on untimely notice. *Cf. Brandon v. Nationwide Mut. Ins. Co.*, 97 N.Y.2d 491, 498 (2002) (holding narrowly that, in the supplementary uninsured motorist context, where notice of *legal action*[4] is untimely, the insurer must show prejudice when issuing a disclaimer). Since *Brandon*, the Court of Appeals has made it clear that the "no prejudice" rule still applies in New York. *See, e.g.*, *Argo Corp. v. Greater N.Y. Mut. Ins. Co.*, 4 N.Y.3d 332, 339–40 (2005) ("*Brandon* did not abrogate the no-prejudice rule and should not be extended to cases where the carrier received unreasonably late notice of a claim."); *Great Canal Realty Corp. v. Seneca Ins. Co., Inc.*, 5 N.Y.3d 742 (2005) ("[T]he carrier need not show prejudice before disclaiming based on the insured's failure to timely notify it of an occurrence[.]").

## IV. Estoppel

Plaintiffs nevertheless argue that CIC's disclaimer should be deemed invalid on grounds of estoppel. "Under New York common law, an insurer, who undertakes the defense of an insured, may be estopped from asserting a defense to coverage, no matter how valid, if the insurer unreasonably delays in disclaiming coverage and the insured suffers prejudice as a result of that delay." *Bluestein & Sander v. Chicago Ins. Co.*, 276 F.3d 119, 122 (2d Cir. 2002) ("*Bluestein II*")

---

[4] The Court of Appeals in *Brandon* specifically distinguished between notices of claim and notices of legal action:

> Thus, unlike most notices of claim—which must be submitted promptly after the accident, while an insurer's investigation has the greatest potential to curb fraud—notices of legal action become due at a moment that cannot be fixed relative to any other key event, such as the injury, the discovery of the tortfeasor's insurance limits or the resolution of the underlying tort claim.

97 N.Y.2d at 498.

9

(citing *Globe Indem. Co. v. Franklin Paving Co.*, 430 N.Y.S.2d 109, 111 (2d Dep't 1980)). Prejudice is presumed "where an insurer, though in fact not obligated to provide coverage, without asserting policy defenses or reserving the privilege to do so, undertakes the defense of the case, in reliance on which the insured suffers the detriment of losing the right to control its own defense." *Albert J. Schiff Assocs., Inc. v. Flack*, 51 N.Y.2d 692, 699 (1980). However, where the insurer has reserved its right to disclaim on the basis of a particular defense later asserted, the insured must show that (1) the delay in disclaiming was unreasonable, and (2) actual prejudice ensued as a result. Whether the insurer unreasonably delayed in issuing a disclaimer depends on when the insurer was "aware of sufficient facts to issue a disclaimer." *Bluestein II*, 276 F.3d at 122 (quoting *Mount Vernon Fire Ins. Co. v. Unjar*, 575 N.Y.S.2d 694, 696 (2d Dep't 1991)).

Here, CIC explicitly reserved its right to disclaim for untimely notice, so prejudice may not be presumed. *Cf. Bluestein & Sander v. Chicago Ins. Co.*, 2001 WL 167707, at *1 (S.D.N.Y.), *aff'd*, *Bluestein II*, *supra* (prejudice presumed where reservation of rights letter did not include defense upon which CIC disclaimed coverage). CIC argues the nearly 21-month delay in disclaiming coverage was caused by plaintiffs' failure to provide information regarding the Plymouth lawsuit, despite CIC's request in the reservation of rights letter. Furthermore, CIC points out that the policy requires the insured to provide CIC "with the fullest information obtainable as soon as practicable" in case of a potential claim. The insured is also required to "immediately forward . . . every demand, notice, summons or other process" in case of a "Claim." (Pls.' Ex. C at 5.) CIC maintains it only received limited information from plaintiffs on June 27, 2000, when the Silverman firm forwarded (1) the letters exchanged with Plymouth in March 1999, (2) a fax from Plymouth, dated October 13,

1999, which contained a letter from the Office of the Securities Commissioner of Kansas,[5] and (3) a December 7, 1999 letter from Gary Mair agreeing to forward documents upon receipt of an outstanding bill. Plaintiffs add that, on August 9, 2001, they forwarded a copy of their response to Plymouth's interrogatories, which includes that "Epifania [one of Plymouth's principals] tried to blame the violative sales on improper advice from the Silverman firm" at a November 1999 meeting. (Pls.' Ex. P.) CIC claims it did not receive Plymouth's November 18 and 30, 1999 letters until six days before it issued the disclaimer letter on April 23, 2002.

CIC stated the following reasons in its disclaimer letter:

> Based upon the information in our possession it appears, among other things, that beginning in or about March 1999, the claimant advised you that it believed you had provided erroneous legal advice and/or services in connection with its use of outside "finders" to sell its securities, and that such sales had occurred in states where you had not made certain "Blue Sky" filings. Beginning in or about September 1999, the claimant advised you that it was concerned about the effect of such erroneous legal advice and/or services. Beginning in or about November 1999, the claimant advised you that it believed that SC&C had provided negligent legal advice and/or services, and thereafter terminated its attorney/client relationships with SC&C. Yet, CIC first was provided with written notice of this matter on July 19, 2000.
> . . . .
> . . . . Specifically, while it appears you were aware in 1999 of acts, errors, or omissions in the rendering of or failure to render professional services which could reasonably be expected to be the basis of a claim, written notice of same was not timely provided to CIC until July 19, 2000.

Although CIC urges its delay in disclaiming was because of lack of information from plaintiffs, the disclaimer letter emphasizes plaintiffs' knowledge of Plymouth's allegations in March 1999. It is undisputed that, on July 27, 2000, plaintiffs sent CIC a copy of Gary Mair's March 15, 1999 letter to Plymouth and Plymouth's response, dated March 19, 1999, stating that any use commissioned finders was "[u]nder the advice of Mr. Paul Chernis" and that they believed they were "strictly

---

[5] The fax references two letters, but only one appears to be attached in plaintiffs' Exibit O.

adhering" to advice from Chernis and Freedman. From these documents received on July 27, 2000, CIC had sufficient information to know that plaintiffs' notice to CIC on July 19, 2000 was untimely. This delay is disclaiming is unreasonable as a matter of law. *See, e.g.*, *Bluestein II*, 276 F.3d at 122 (nine-month delay unreasonable).

The next element required for estoppel to apply, that prejudice has ensued, is generally a question of fact. *See, e.g.*, *Ferraraccio v. Hartford Ins. Co.*, 590 N.Y.S.2d 968, 969 (4th Dep't 1992); *Am. Stevedores, Inc. v. Sun Ins. Office, Ltd.*, 248 N.Y.S.2d 487 (Sup. Ct., N.Y. County 1964). Plaintiffs argue they were prejudiced because Morgan Melhuish, in controlling the defense of plaintiffs in the Plymouth lawsuit, failed to depose witnesses they claim were "key" to their defense. These witnesses include (1) Michael Menicucci, who had attended the meeting in June 1998 where Mr. Chernis allegedly told Plymouth to use unlicensed finders,[6] (2) Michael Orlino, one of Plymouth's principals, (3) Jennifer Schwartz, Plymouth's office manager, who allegedly told Mr. Freedman that she believed Plymouth was selling securities through a boiler room operation, and (4) the finders used by Plymouth. Plaintiffs label Mr. Menicucci as "arguably the most crucial witness" in the Plymouth case and argue prejudice is clear because Mr. Menicucci now lacks recollection of what was said during the June 1998 meeting. CIC counters that Mr. Menicucci's testimony is irrelevant because the Silverman firm's written offering materials specifically allowed for Plymouth's illegal use of unlicensed finders. Plaintiffs argue that Plymouth's allegations of negligence must be limited to what transpired at the June 1998 meeting because the offering

---

[6] CIC disputes Mr. Menicucci's attendance at this meeting based on Mr. Freedman's statement in a letter, dated March 30, 1999, that neither he "nor Paul Chernis have ever met with Michael Menicucci regarding Plymouth." (Pls.' Ex. O.) However, Mr. Freedman's statement appears inaccurate since Mr. Menicucci's attendance has been confirmed by Mr. Chernis and both of Plymouth's principals, Michael Orlino and Louis Epifania.

memorandum is not negligent on its face, as using finders for a private placement is permitted under Regulation D. In support of this, plaintiffs cite Harold S. Bloomenthal, Securities Law Handbook § 19.3 (2004):

> A finder is a person whose role is limited to "finding" investors for an issuer that is making or proposing to make a securities offering. Factors mitigating in favor of a "finder" being deemed a broker subject to registration as such include assisting with sales efforts, receiving commissions or transaction-based compensation, participating in negotiations between the issuer and investors, and giving advice concerning valuation of the securities. A person may be able to avoid broker-dealer registration if his or her role is limited to introducing the parties or merely giving names to the issuer.

(Pls.' Mem. at 9.) With regard to plaintiffs' attempt to show that, generally, using finders is not a prohibited practice, the court must note that the offering memorandum contained no restrictions on *how* finders were to be used. Indeed, the passage quoted by plaintiffs lists "receiving commissions" among the reasons why finders might be subject to registration.

Nevertheless, whether the Silverman firm was negligent is not at issue here. Whether loss of witnesses' testimony or other factors caused plaintiffs to suffer prejudice from CIC's delay in disclaiming cannot be determined as a matter of law. Plaintiffs' summary judgment motion based on estoppel is granted to the extent that the court finds CIC's delay in disclaiming unreasonable as a matter of law, but it is denied as to the question of ensuing prejudice, which is a question of fact for the jury to determine.

## V. Conclusion

Plaintiffs' and defendant's summary judgment motions are granted in part and denied in part. Summary judgment is granted to defendant on the issue of plaintiff's untimely notice under the

insurance policy and granted to plaintiffs insofar as defendant's delay in disclaiming was unreasonable as a matter of law. The only issue remaining for trial, as to which summary judgment is denied, is whether plaintiffs were prejudiced by CIC's delay in disclaiming, which would bar CIC's disclaimer on estoppel grounds.

SO ORDERED.

DATED:   Brooklyn, New York
         September 27, 2005

_____/s/_____
DORA L. IRIZARRY
United States District Judge